IN THE UNITED STATE DISTRICT COURT

FOR THE  DISTRICT OF IDAHO

| | | |
|---|---|---|
| RODOLFO TREVINO, III, | ) | |
| | ) | CV04-86-S-MHW |
| Petitioner, | ) | |
| | ) | **MEMORANDUM ORDER** |
| vs. | ) | |
| | ) | |
| JOHN HARDISON, Warden,[1] | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

Pending before the Court in this habeas corpus matter are the following:

Respondent's Motion for Summary Judgment (Docket No. 27), Petitioner's Motion for

Summary Judgment (Docket No. 35), Respondent's Motion for Extension of Time

(Docket No. 37), and Petitioner's Motion to Substitute Party (Docket No. 41).  Both

parties have consented to the jurisdiction of a United States Magistrate Judge to enter

final orders in this case.  Having reviewed the record, the Court finds that oral argument

is unnecessary.  Accordingly, the Court enters the following Order.

---

[1]John Hardison, new Warden of Idaho Maximum Security Institution, has been substituted in place of former Respondent Warden Glen Turner, who has retired.  *See* Docket No. 41.

MEMORANDUM ORDER 1

# I.

## PRELIMINARY MOTIONS

Respondent filed a Motion for Extension of Time to file a reply in support of his Motion for Summary Judgment (Docket No. 37).  Good cause appearing, the Motion is granted.  The Reply has been filed and is considered timely (Docket No. 39).

Petitioner filed a Motion to Substitute Party (Docket No. 41).  Good cause appearing, John Hardison, new warden of the Idaho Maximum Security Institution, shall be substituted for retired warden Glen Turner.

# II.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.    Background

The Court previously dismissed Petitioner's Claims 3, 4, and 5.  Currently pending are Claims 1, 2, 6, and 7, which are as follows:

(1)    Police officers used impermissibly suggestive identification procedures in violation of Petitioner's right to due process of law;

(2)    The trial court violated Petitioner's constitutional right to present a complete defense when it excluded the results of Petitioner's polygraph test;

(6)    Petitioner's right to the effective assistance of counsel was violated when trial counsel failed to call a defense expert to rebut the State's expert;

(7)    Petitioner's counsel was  constitutionally ineffective for failing to file an Idaho Criminal Rule 35 motion for reduction of sentence.

Both parties have filed summary judgment motions on Claim (1).  In addition, Respondent asserts entitlement to summary judgment on Claims (2), (6) and (7).

MEMORANDUM ORDER 2

**B.      Standard of Law**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Federal Rules of Civil Procedure apply to habeas corpus actions except where application of the rules would be inconsistent with established habeas practice and procedure.  Rule 11, Rules Governing Section 2254 Cases.  Accordingly, summary judgment motions are appropriate in habeas corpus proceedings where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977).

In order to obtain federal habeas corpus relief from a state court judgment, the petitioner must show that the state court's adjudication of the merits of his federal claim either:

> 1.  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2.  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 385 (2000), the United States Supreme Court explained that, to prevail under § 2254(d)(1), a petitioner must show that the state court

MEMORANDUM ORDER 3

was "wrong as a matter of law," in that it "applie[d] a legal rule that contradicts our prior holdings" or that it "reache[d] a different result from one of our cases despite confronting indistinguishable facts." *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (citing *Williams v. Taylor*).  Or, a petitioner can prevail by showing that the state court was "[objectively] unreasonable in applying the governing legal principle to the facts of the case," or "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled," *Ramdass v. Angelone*, 530 U.S. at 166 (citing *Williams v. Taylor*); however, a petitioner cannot prevail under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411.

## C.    Claim 1

Claim 1 is that police officers used impermissibly suggestive identification procedures in violation of Petitioner's right to due process of law, and that, as a result, witness Larry Curtis' identifications of Petitioner should have been deemed inadmissible. Both parties assert entitlement to summary judgment on this claim.

On March 14, 1995, Curtis and victim Ryan Wiggins were riding together in a truck when they began backing up into the path of a Suzuki Sidekick with three occupants, Rudy Trevino, Tito Cantu, and Cliff Velasquez.  The Suzuki followed the truck onto the road, where the men in the two vehicles exchanged fighting words. Wiggins (a passenger in the truck) and Cantu (a passenger in the Suzuki) got out of their

MEMORANDUM ORDER 4

vehicles and began a fistfight.  When Wiggins began getting the best of Cantu, Cantu called for help.

At that point, Trevino, the driver of the vehicle, got out and struck Wiggins on the head twice with a sawed-off shot gun that had no stock.  When Wiggins slumped down against a barbed wire fence, Trevino fired one shot at close range into Wiggins' chest.  Trevino and Cantu jumped back into the Suzuki and left the scene.  Curtis memorized and later reported the license plate number of the Suzuki to police.  The vehicle was registered to Trevino.  Wiggins, 18 years old, died at the scene.

Directly after the shooting, Trevino stopped at his father's house.  Shortly thereafter, he ran the Suzuki off a canyon cliff and his father drove him home.  *See State's Exhibit A-4*, at p. 1175-77.  Cantu and Velasquez accompanied Trevino and his father to the canyon.

The gun, which was owned by Cantu but stored at Trevino's home, was abandoned along the roadway, together with several shotgun shells.  It bore no fingerprints.  Later, shotgun shells of the same brand, gauge, and shot size as those found with the weapon were seized from Trevino's house under a search warrant.  Trevino came to the Twin Falls Police Department on the day Wiggins was killed and reported that his Suzuki had been stolen.  Almost one year later, after lying to police officers and a magistrate judge about his knowledge of and involvement in the incident, Cantu came forward and led police to the canyon where Trevino had disposed of the Suzuki.  Trevino was then arrested, tried, and convicted of Wiggins' murder.  *See State's Exhibit B-4*, at pp. 1-2.

MEMORANDUM ORDER 5

Several hours after Wiggins was killed, Detective Heidemann showed Curtis a photographic lineup of six men.  Curtis was given a written advisory statement indicating that he should not conclude or guess that the photograph lineup contained the picture of the person who committed the crime.  The transcript of the lineup interview is as follows:

> Heidemann:   Okay.  Before I show you the photographs, I have to have you read this paragraph.  And I'll fill this out. [pause - hands the photographs to Curtis]
>
> Heidemann:   Take your time.  Look at it closer.  You can hold it if you'd like.
>
> Curtis:   Are all three supposed to be on here?
>
> Heidemann:   No.  Only the person that we believe to be the shooter is there.
>
> Curtis:   [pointing to far left picture in top row] This guy looks like the big guy that, he was fighting with me [sic]. This guys looks like the one that shot him.  But . . . [pause - looking at photos]  Number one would have been the shooter.
>
> Heidemann:   All right.  Okay.  If you'd put your name and address on here and your date of birth.  And then tell me that uh, you were requested to come in and identify a photographic lineup and that you identified number one as the shooter.
>
> Curtis:   [looking at photos and writing] What's our address out there?
>
> [Female]:   [inaudible]
>
> Heidemann:   (to Lt. Axtman) You want to call Chuck now?
>
> Curtis:   I didn't identify him?

MEMORANDUM ORDER 6

Axtman:        (inaudible) I'll call him.

Heidemann:   We did not want to show you the other photographs of
             the other two because we would still have to have a
             complete other set of photographs and we didn't want
             you to look at too many faces first.  We wanted you to
             look at the face . . .
             [Lt. Axtman returns]

Axtman:        Uh, are you going to want to go off, off record now?

Heidemann:   Just as soon as he's completed. . . .

Axtman:        Oh. Okay.
             [pause - Curtis examining the photos again]

Curtis:        Can I look at these?

Heidemann:   Pardon me?

Curtis:        Can I look at these (inaudible)?

Heidemann:   You can hold it.  [hands Curtis the photographs -
             pause]  However, keep in mind what this says right
             here.  We may not have the person there.  We believe
             we do, but that's why we need you to take a look at the
             pictures.  I would say, if, if, when you recall the
             incident and you try to recall the face, you see the face
             here and if you think the face is number one, then I
             would take a statement at this time that you believe it's
             number one.  We are requesting the department's
             compu-sketch artist to come in and then he will sit
             down with you right away and come up with a likeness
             of the face.  Okay?  The features that you recall.

Curtis:        Um . . .  [pause - Curtis examining photographs]

Heidemann:   All right, so just write a statement that you
             identified number one from a photo lineup.
             [Curtis writing]

MEMORANDUM ORDER 7

Axtman:        That it?  All you need to do is sign it then.

*State's Exhibit A-6*, at 30-33 (the video tape of the interview is State's Exhibit 19).

The photographic lineup showed six photographs, with three on the top row, and three on the bottom row. Curtis selected photograph #1 from the lineup, the photo in the top left corner of the page.  Trevino's photo was photograph #2, in the top middle of the page.  Petitioner alleges that after Curtis identified #1 as the shooter, Heidemann gave the lineup page back to Curtis, while covering up photograph #1 with his hand and tapping on photograph #2 with his finger to draw attention to it.  Curtis studied the photographs at length again, selected photograph #1 again, and wrote a statement showing that his selection was photograph #1.  *See Petitioner's Brief*, at p. 4 (Docket No. 34).

While Curtis was still at the police station, Detectives told him that the registered owner of the Suzuki was coming to the police station to report his vehicle stolen.  *State's Exhibit A-5*, at pp.98-99.  Police had Curtis look at Trevino from behind protective glass. Curtis could not identify Trevino until Trevino removed his hat.  At that point, Curtis identified him but stated: "The person looked like he had a haircut from the time of the shooting at Circle K."  *State's Exhibit A-4*, at p. 1608.  At the suppression hearing, Curtis stated that he had no doubt that Trevino was the shooter.  *State's Exhibit A-3* at p. 167. Trevino's claim is that Curtis' identification of Trevino at the showup was tainted by suggestiveness in the photographic lineup, and Curtis' identification of Trevino at trial, *see State's Exhibit A-3*, at p. 869-70, was tainted by suggestiveness from the photograph lineup and the showup.

MEMORANDUM ORDER 8

1.      United States Supreme Court Precedent

The United States Supreme Court has held that "convictions based on eye-witness identification at trial following a pretrial identification procedure will be set aside on [due process grounds] only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. U.S.*, 390 U.S. 377, 384 (1968).  The *Simmons* Court noted that, in using this test, "each case must be considered on its own facts."  *Id*.  The Court was unwilling to prohibit the employment of photographic lineups given that the danger of misidentification from this technique "may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error."  *Id*.

To determine whether a challenged identification procedure was unduly suggestive so as to substantially affect the reliability of the identification, a district court reviews the totality of the circumstances.  *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *Stovall v. Denno*, 388 U.S. 293, 302 (1967).[2]  In order to assess whether a suggestive procedure gave rise to a "substantial likelihood of irreparable misidentification," the court must weigh the "corrupting effective of the suggestive identification [procedure]" against the five factors set forth in *Neil v. Biggers*: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the prior description of the criminal; (4) the level of certainty demonstrated at the

---

[2]*Stovall* was overruled on other grounds (retroactivity analysis) by *Griffith v. Kentucky*, 479 U.S. 314 (1987), not applicable here.

MEMORANDUM ORDER 9

identification; and (5) the length of time between the crime and the identification.

*Manson v. Brathwaite*, 432 U.S. 98, 108, 114 (1977).

In *Stovall*, the Court stated:

> The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it....

388 U.S. at 302.  In *Stovall*, officers' actions in bringing the suspect to the hospital to see if a critically wounded victim/witness could identify him was deemed appropriate under the emergency circumstances and not a violation of due process.  *Id.*

In *Foster v. California*, 394 U.S. 440 (1969), the Court reviewed a robbery case where the only witness to the robbery, Joseph David, was first shown a lineup of suspects, then shown a one-person showup, and then shown another lineup, with the only common person in all three being Walter Foster.  David also identified Foster at trial.  On these facts, the Court found a due process violation, noting:

> The suggestive elements in this identification procedure made it all but inevitable that David would identify petitioner whether or not he was in fact "the man."  In effect, the police repeatedly said to the witness, "This is the man."
> *   *   *
> In the present case the pretrial confrontations clearly were so arranged as to make the resulting identifications virtually inevitable.

*Id*. at 443.   The case was reversed and remanded for the lower court to conduct a harmless error analysis.  *Id*. at 444.

If, after considering the foregoing precedent and the particular circumstances of

MEMORANDUM ORDER 10

the case before it, the federal district court determines that the lineup and/or showup in question did not give rise to an irreparable misidentification, then the jury is left to weigh the evidence of the circumstances surrounding a witness's identification of the defendant. *Brathwaite*, 432 U.S. at 116.  The Supreme Court has observed: "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."  *Id*.

       2.   <u>Idaho Supreme Court Decision</u>

The Idaho Supreme Court correctly recognized *Neil v. Biggers*, *Stovall v. Denno*, *Manson v. Braithwaite*, and *Foster v. California* as governing case law.  *State's Exhibit B-4*, at p.4 (Docket No. 13).  The court noted the totality of circumstances test and the five *Biggers* factors.  *Id*. at p. 5.

In analyzing the trial court's decision, the Idaho Supreme Court determined that Trevino's rights were not violated:

> Applying a totality of the circumstances test, the district court properly found that the out-of-court identification did not violate Trevino's due process rights.  The district court found that Curtis' opportunity to observe the shooter was probably minimal, but the situation was very intense, at a very close proximity to the witness, and commanded a high degree of attention from the witness.  The district court noted that there were issues of lighting and that Curtis had just come from a bachelor party where he had consumed alcohol, but that Curtis's physical description of Trevino was not inaccurate.  Finally, the district court found that the showup took place between twelve and fifteen hours after the shooting, which was not an unreasonable delay that could have distorted the witness' recall.

*State's Exhibit B-4*, at pp. 5-6.

MEMORANDUM ORDER 11

The Idaho Supreme Court distinguished *Foster* in this manner:

> In *Foster*, the identification was made after a second in-person lineup where the person selected was the only one who had appeared in both lineups.  In Trevino's case, the photo of Trevino that was not selected by the witness had been taken two years earlier and looked significantly different from Trevino as he appeared the day of the showup.  The district judge, who viewed the videotape in the proceeding to decide Trevino's motion to suppress the identification, rejected Trevino's contention that Detective Heidemann had tapped on the photo of Trevino after Curtis made his choice but before the one-man showup.  In addition, the district court found that any suggestions by Detective Heidemann had no effect on Curtis, who did not change his mind about the photo lineup.

*Id*. at p. 5.

The Idaho Supreme Court concluded:

> We find any suggestiveness in the conduct of the photo lineup was too subtle to be meaningful.  Thus, we affirm the district court's conclusion that the lineup procedures were not so suggestive as to taint the subsequent identification of Trevino by Curtis.  We also affirm the admission of the identification which, as the district court found, was marked by indicia of reliability.

*Id*. at pp. 5-6.

### 3.  Whether There Was an Unreasonable Determination of the Facts

Petitioner first asserts that the videotape of the photographic lineup interview (Exhibit No. 19) shows that the lineup was unduly suggestive because Detective Heidemann allegedly pointed to Trevino's photograph after telling witness Larry Curtis that he believed the shooter was in the lineup and after he suggested that Curtis had selected the wrong person by nodding his head or saying, "all right," in an exasperated manner.  Petitioner alleges that Heidemann then tapped right next to Mr. Trevino's

MEMORANDUM ORDER 12

photograph (suspect #2 in the lineup), while he covered the photograph of the person

selected by Mr. Curtis (suspect #1).  Heidemann admitted to tapping on the photograpic

lineup at the hearing on the motion to suppress the lineup:

> Q.    Do you deny tapping on the photo lineup at that portion of the interview?
>
> A.    No, I don't deny tapping on the lineup.
>
> Q.    Do you deny tapping on the upper center photograph when you tapped on the lineup?
>
> A.    You could see where I tapped.
>
> Q.    You were tapping on the upper center of the lineup; correct?
>
> A.    It appeared somewhere in this area up in here.
>
> Q.    Which is the area in which Rudy Trevino's photo was; correct?
>
> A.    Correct.

*State's Exhibit A-3*, at p. 232.

At the suppression hearing, Larry Curtis, the witness, stated that Detective

Heidemann did not tap on the photo lineup and did not point to the middle photograph.

*State's Exhibit A-3*, at p. 102 & 162.  This statement is consistent with the trial court's

finding that the tapping did not occur:

> There is an allegation by the defense that, in fact, Mr. Heidemann
> then tapped the photographic lineup to try to point to Mr. Trevino.
>  The court specifically finds that that did not occur for purposes of
> this argument.  I have looked at the tape time and time again at different
> speeds, and I just don't see that type of move.  Obviously, those of you who
> know me, if I would have seen it, it would be, that identification would be

MEMORANDUM ORDER 13

gone immediately.

*State's Exhibit A-5*, at p. 92.   The state district court also found that the lineup contained an older photograph of Trevino.  *Id*. at p. 97.

At the suppression hearing, Curtis testified that after he made his identification of photo #1, he did not know which of the remaining five photos the detectives thought was the shooter.  *Exhibit A-3*, at p.103-04.  Curtis did not know if the person in the lobby was also depicted in the photos.  *Id*. at 109.  Curtis did not recognize the person in the lobby from one of the photos.  *Id*. at 110.

Petitioner asserts that the state district court made an unreasonable determination of the facts in light of the evidence presented.  This Court has reviewed the videotape of the alleged tapping incident several times and agrees with the state district court that there is no discernable tapping on the tape.  *State's Exhibit 19* (Docket No. 45).

In a federal habeas corpus proceeding, a state court's determination of a factual issue is presumed to be correct.  28 U.S.C. § 2254(e)(1).   "[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court record was not merely wrong, but actually unreasonable."  *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003), and *Torres v. Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000) (same standard of unreasonableness applies to subsections (d)(1) and (d)(2))).

In *Taylor v. Maddox*, the court established a two-part analysis under §§2254(d)(2) and (e)(1).  366 F.3d at 999-1000.  First, under § 2254(d)(2), the court performs an

MEMORANDUM ORDER 14

"intrinsic review" of the state court's factfinding *process* (not its findings).  A state court

fact finding process might be an "unreasonable determination" of the facts if, for

example, "the state court should have made a finding of fact but neglected to do so,"

where the state court made factual findings, but did so under an incorrect legal standard,

or "where the fact-finding process itself is defective."  *Id*. at 1000-01.

 If the state court's factfinding process was not an unreasonable determination, then

the court next reviews the findings, applying the presumption of correctness in 28 U.S.C.

§ 2254(e)(1).  *Id*. at 1000.  It reviews any "extrinsic evidence" presented for the first time

in federal court.  *Id*.  The petitioner bears the  burden to rebut the presumption of

correctness by clear and convincing evidence.  § 2254(e)(1).

 Here, the intrinsic review of the state court's factfinding process shows no

unreasonable determination of the facts.  The state court held an evidentiary hearing on

the motion to suppress, heard evidence, and reviewed the videotape several times at

several different speeds.  Petitioner does not argue that the court used the wrong legal

standard.  He simply argues that the factfinding was wrong.

 This argument leads the Court to the second part of the *Maddox* analysis – whether

to apply the presumption of correctness.  Petitioner offers no new extrinsic evidence in

federal court; rather, he urges the Court to find that the state court's review of the

videotape simply was in error.  The Court has reviewed the videotape and finds and

concludes that the state court's determination that there was no discernable tapping on the

videotape is not unreasonable.  Detective Heidemann does make some hand gestures over

MEMORANDUM ORDER 15

the photo lineup as he is speaking to the witness, but the gestures do not clearly

communicate any message but seem to merely emphasize what the Detective is saying –

that he did not want to show the witness too many photos at once.

Finally, even if the hand gestures were meant to convey a message, there is

nothing in the record showing that witness Larry Curtis saw any tapping or that he

received or understood any message that the tapping was supposed to convey.  As a

result, the Court concludes that Petitioner has not rebutted the presumption of correctness

of the state court factual findings, and his § 2254(d)(2) argument does not warrant relief.

4.      Whether the Decision Was an Unreasonable Application of Law

Petitioner asserts that the Idaho Supreme Court's decision that the pretrial

identification was not so unduly suggestive as to give rise to a substantial likelihood of

irreparable misidentification was contrary to or an unreasonable application of governing

United States Supreme Court law.  He relies on *Simmons v. U.S.*, 390 U.S. 377 (1968).  In

*Simmons*, the Court warned against pretrial identification procedures in "which the

photograph of a single . . . individual recurs or is in some way emphasized."  *Id*. at 383.

There, FBI agents had obtained approximately six group photographs, each depicting two

of the suspects, including Simmons, and also depicting other individuals.  Each of five

witnesses viewed the photographs alone without any suggestion from FBI agents as to

who in the photos was under suspicion, and each witness separately identified Simmons

MEMORANDUM ORDER 16

from the photographs.  *Id.* at 382. The United States Supreme Court concluded that "in the factual surroundings of this case the identification procedure used was not such as to deny Simmons due process of law."  *Id*. at 386.

Petitioner also argues that the Idaho Supreme Court unreasonably distinguished *Foster v. California*, *supra*, where a photographic lineup followed by a one-person showup was deemed a procedure arranged so as to "make the resulting identifications virtually inevitable."  394 U.S. at 443.  Petitioner also argues that the Idaho Supreme Court unreasonably applied the five factor *Biggers* test.  The Court will address Petitioner's arguments in turn.

First, the Idaho Supreme Court's decision that Petitioner's case was unlike *Foster* is not an unreasonable application of that case and was not contrary to *Simmons*.  In both *Foster* and *Simmons*, the common factor is that there were multiple showings of the same person *that the witness recognized as being the same person*.  Based on the circumstances of each case, the *Foster* showings were deemed a constitutional violation, while the *Simmons* showings were not.

In Petitioner's case, witness Larry Curtis did not ever come close to identifying Petitioner by his photograph, did not know which photograph detectives thought was the shooter, did not ascertain or understand the alleged hint detectives gave to identify Petitioner's photograph, and did not ever make a connection between what he called the "crappy pictures," *State's Exhibit A-3*, at p. 109, and the live person he identified in the police lobby in the showup.  Another pertinent finding of fact the district court made was

MEMORANDUM ORDER 17

that the photograph of Petitioner included in the lineup was two years old and looked significantly different than when Petitioner showed up in the lobby.  *See State's Exhibit A-5*, at p. 97; *State's Exhibit A-3*, at p. 223-24; *State's Exhibit B-4*, at p. 5.

On these facts, the state district court concluded, "Mr. Curtis, probably knowing he was wrong, still did not change his mind in the photo lineup; and I think that does insulate, in fact, the showup identification from the taint of, alleged taint, by the defense." *State's Exhibit A-5*, at p. 95-96.  In other words, in Petitioner's case, the taint – which is that "the witness . . . is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification" – is absent because there was no identification of Petitioner at the photo lineup, the photo did not look like Petitioner at the showup, and the photo played no role in the witness' identification of Petitioner at the showup.  *Simmons*, 390 U.S. at 383-84.  Because Curtis had no recognition that both the lineup and the showup contained the same person, the Idaho Supreme Court was not unreasonable in failing to grant relief upon the principles articulated in *Foster* and *Simmons*.

The Court now turns to whether the Idaho Supreme Court unreasonably applied the five-part *Biggers* test.  Because the Idaho Supreme Court relied on the state district court's findings of facts as to the totality of circumstances, the Court reviews the detail of the state district court's findings to shed further light on the Idaho Supreme Court's decision.

      *a.*     *the opportunity of the witness to view the suspect at the time of the*

MEMORANDUM ORDER 18

*crime*

The state district court found the following facts relevant to the first factor:

> The opportunity to observe the shooter as this fight opened up, it was probably minimal.  But you have to understand, then the shooter gets out of the car that Mr. Curtis is standing next to, he runs down.  Mr. Curtis watches him hit his friend on the head and shoot him and run back.  He does avert his eyes.  Curtis probably averted his eyes out of self-defense so that this person would not attack him, as well as to look at the license [plate] of the get away car.  But again we are in a short proximity in a very intense situation and a very close proximity to the individual.

*State's Exhibit A-5*, at p. 96.  While the minimal time frame for observation weighs in

Petitioner's favor, the court was not unreasonable in determining that the close proximity

of Curtis to the shooter in an intense situation involving Curtis' best friend weighs against

Petitioner.

           *b.*    *the witness's degree of attention*

The state district court found the following facts supporting this factor:

> Mr. Curtis' testimony is that he has no doubt.  Mr. Curtis' testimony is that he felt he got a good look at the shooter.  The degree of attention, it's got to be high.  I am sure his eyes were riveted, once he saw what was happening to Mr. Wiggins and once the defendant, or the shooter, started running back toward Mr. Curtis.
>
> I just can't imagine anything else being more intense.  I understand there is an argument that because of that intensity, the eyewitness testimony may not be any good.  Be that as it may, I still think that there would be a high degree of attention.  It's not as if we were walking down the street and a group of unknown individuals to our side were in a fight and all of a sudden a shot rang out.

*State' Exhibit A-5*, at p. 96-97.  The state district court and the Idaho Supreme Court

acknowledged that the argument that the intensity of the incident could cut in favor of

MEMORANDUM ORDER 19

Petitioner's position, but the state district court found that there would still be a "high degree of attention" because the witness's attention was already focused on the scene and it did not involve mere strangers.  This factor weighs slightly against Petitioner, and therefore, this portion of the state court decision is not unreasonable.

Petitioner argues that the lighting was poor where the fight took place, that Curtis had just come from a bachelor's party where he had consumed alcohol, that Curtis was likely fatigued because of the early morning hour, and that Curtis did not even notice that Titu Cantu, who was fighting with Wiggins, had a prosthetic hand that fell off during the fight.  These factors weigh in favor of Petitioner; however, given the state court's emphasis on  Curtis not being a casual stranger, but being invested in the intense incident that would have captured his attention, this Court concludes that weighing this factor against Petitioner, even if erroneous, is not unreasonable.

Curtis did not originally tell officers that he saw the driver get out of the vehicle at Circle K prior to the fight, but at the suppression hearing, Curtis testified that he later remembered seeing the driver get out of his vehicle in the well-lit parking lot of Circle K. The state trial court did not address Curtis's Circle K identification as part of its factors. Petitioner argues that, if Curtis had seen him at the Circle K prior to the incident, Curtis would have had no reason to pay attention to Petitioner's face.  Because the state district court did not rely on this factor, and it cuts both ways depending on credibility (either it increases the validity of Curtis' at-the-scene identification, or it shows Curtis later embellished his memory to bolster his identification), the Court finds that consideration of

MEMORANDUM ORDER 20

this point does not tip the scale either way.

        *c.*    *the accuracy of the witness' prior description of the subject*

The state district court found the following facts relevant to this factor:

> Number three, the physical description is within, is not way off the mark.  I do believe that the physical description indicated, Mexican male, five foot seven, to about Mr. Curtis's height, which is six foot, that's within four to five inches, short hair, dark, I just don't see any significant problem with that physical description.

*State's Exhibit A-5*, at p. 97.  The Idaho Supreme Court treated Petitioner's argument on this factor as follows:

> Trevino challenges Curtis's description of the shooter, disagreeing with the district court that it was accurate, in part, because he was not readily able to identify Trevino in a one-on-one showup until Trevino removed his hat.  Curtis identified Trevino only with reservation, commenting that the shooter had cut his hair since the shooting.  Such a comment does not mean that Curtis's description was inaccurate and may indicate a detail that supports his identification of Trevino.

*State's Exhibit B-4*, at 6.

      This Court agrees with this analysis.  Curtis first described the shooter as having "short, short black hair."  *State's Exhibit A-6*, at p. 1.  Curtis described the person in the lobby as "shaved."  *State's Exhibit A-3*, at p. 169.  The description "short, short" hair is not far afield from "shaved," with or without a haircut.

      Further, if an individual already had "short, short" hair and wanted to change his appearance to avoid identification, the next step would be to go to a "shaved" look.  While Detective Heidemann found no specific evidence showing that Petitioner had gotten a haircut, *State's Exhibit A-4*, at p. 1470, there was evidence at trial that Petitioner

MEMORANDUM ORDER 21

took other steps to avoid detection, such as wiping the gun clean and running his vehicle off of a cliff.  Therefore, the Idaho Supreme Court's conclusion that the haircut "may indicate a detail that supports identification" is not unreasonable in light of the record.

Further, Curtis' other details are not far afield, either.  Though Curtis wavered in his height description of Petitioner from between five feet seven inches (preliminary hearing description) and six feet tall (original police interview description), the upper end of these approximations was correct.  Similarly, Curtis estimated Petitioner's age at 17 to 18 and not more than 20; Petitioner was 23.  Curtis described Petitioner's coat as both a "dark, long coat," and  "like one of those Raiders jackets, . . .[l]ike it was coming over his regular jacket."  *State's Exhibit A-6*, at p. 7; Petitioner argues that it was only a long black leather jacket, not an "Oakland Raiders" jacket, but does not address whether Curtis was merely trying to describe a type of jacket that "was coming over his regular jacket," not necessarily one with a Raiders' emblem on it.  Petitioner did, in fact, wear a long, black jacket on the date of the incident.  Petitioner has not taken issue with Curtis's description of him as a really dark-skinned individual of Mexican descent.  *State's Exhibit A-6*, at pp. 6-7.  Based upon all of the foregoing, this factor weighs against Petitioner, making the state court decision not unreasonable on this point.

> d.    *the level of certainty shown by the witness at the confrontation*

As to this factor, the state district court simply noted that the photographic lineup did not make the subsequent identification constitutionally infirm.  *State's Exhibit A-5*, at p. 98.  While Curtis could not identify a two-year-old photograph of Petitioner, the state

MEMORANDUM ORDER 22

court found that the photograph looked significantly different from Petitioner as seen in the lobby, and Curtis positively identified Trevino at the showup, with the reservation that Trevino looked like he had cut his hair since the shooting.  Therefore, this factor weighs against Petitioner because the facts of this case are unlike the multiple showings cases like *Foster* and *Simmons*, as described above.

On this factor, Petitioner points to testimony from his expert at trial, who stated that since the time period that has elapsed after *Neil v. Biggers* was decided in 1972, researchers have determined that a witness's own statement of his level of certainty is not a very good indicator of whether the identification was, in reality, accurate.  However, because the United States Supreme Court has not seen fit to take up the issue again in light of current research, the Court will conclude that this factor is still relevant.  The Court concludes that it was not unreasonable for the state courts to find that Curtis' positive identification of Petitioner weighs against Petitioner in the *Biggers* analysis.

e.     *the length of time between the crime and the confrontation*

The state district court found that the length of time between the crime and the showup identification was approximately twelve to fourteen hours, or perhaps a little longer.  The court concluded that this was not a long period of time for this type of analysis.  *State's Exhibit A-5*, at p. 98.  This Court agrees that this factor weighs against Petitioner because it is unlike other cases in which many weeks or months passed before a lineup or showup occurred.  *See Neil v. Biggers*, 409 U.S. at 375 (a lapse of seven months would be a serious negative factor in most cases, though not deemed so in *Biggers*).

MEMORANDUM ORDER 23

f.      the corrupting effect of the suggestive procedures

As to the suggestiveness of the detectives' procedures, the state district court found that the detectives' decision to allow Curtis to view Petitioner from behind the safety window was not "overreaching," given the recent killing of his best friend in his presence. *State's Exhibit A-5*, at p. 93.  The state court also noted that Petitioner himself initiated the contact with the police, rather than vice versa.  *Id*.  As noted above, the state court also rejected Petitioner's assertions that Detective Heidemann had nodded his head or tapped on Trevino's photo during the photographic lineup.  The state court further found that because Curtis was not even aware of any alleged tapping, the photographic lineup did not taint the showup.

Detectives did tell Curtis that the owner of the Suzuki was coming to the police station to report the vehicle stolen and that they wanted Curtis to take a look at him. *State's Exhibit A-5*, at p. 98-99.  Although the state court found that officers did not say anything so suggestive as "the shooter is coming," *id*. at 98, officers knew that Curtis believed the driver of the vehicle was the shooter.  Given these facts, there was some chance that the procedure of the showup would lead to misidentification.  However, the suggestion did not make the identification "inevitable,"as in *Foster*; it remained open that the owner would not match Curtis' description of the driver because the vehicle had been stolen or because Cantu or someone else had been driving that night.

The Court also reviews whether there reason to have Curtis view Trevino immediately, rather than wait and put together a live lineup.  The facts show that

MEMORANDUM ORDER 24

Petitioner initiated the contact with the police to report his vehicle stolen at the same time Curtis was at the police station.  The showup was within half a day of the incident, which would mean the information from the shooting was still fresh in Curtis' mind.  *See Simmons*, 390 U.S. at 385.  If Curtis did not identify Trevino, then officers would have had notice to pursue other leads.  *See id*. ("A serious felony had been committed.  The perpetrators were still at large.  The inconclusive clues which law enforcement officials possessed led to Andrews and Simmons.  It was essential for the FBI agents swiftly to determine whether they were on the right track. . . . ").  These factors weigh in favor of detectives' decision to use the showup rather than a later lineup.

Prior to the photograph lineup and showup, Curtis had already given a fairly accurate description of the shooter to police officers.  Curtis already knew from observing the incident, that the driver of the Suzuki was the shooter.  Officers were no doubt suggestive when they told him that the owner of the Suzuki was coming into the police station to report his vehicle stolen, but the question is the reasonableness of the Idaho Supreme Court's decision that the suggestiveness of the showup did not lead to a very substantial likelihood of irreparable mistaken identification." *Stovall*, 388 U.S. at 301-02.

Weighing the *Biggers* factors against the corrupting effect of the suggestive procedures, the Court concludes that the Idaho Supreme Court's decision that the lineup procedures were not so suggestive as to taint the showup identification, and that the showup identification was "marked by indicia of reliability" was not contrary to, or an unreasonable application of, to the United States Supreme Court case precedent discussed

MEMORANDUM ORDER 25

above.  *State's Exhibit B-4*, at p. 6.  As a result, Petitioner is not entitled to relief under §
2254(d)(1).

      5.    <u>Harmless Error</u>

      In the alternative, assuming that the Idaho Supreme Court's decision violated  §
2254(d)(1) or (2), the Court considers a harmless error analysis.  The Idaho Supreme
Court did not reach a harmless error analysis.

      If a federal district court determines that the state court decision was either an
unreasonable application of, or contrary to, United States Supreme Court precedent, the
Court must still review the constitutional error for harmless error.  *Inthavong v.
LaMarque*, 420 F.3d 1055, 1058-59 (9th Cir. 2005).  The Court may not grant habeas
relief unless the petitioner suffered actual prejudice from the constitutional error.  *Id*. at
1059.

      If a state court did not engage in a harmless error analysis, or if it applied the
wrong standard, a federal district court on habeas corpus review applies the standard
articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *Inthavong v. LaMarque*, 420
F.3d at 1059-60 (citing with approval *Cargle v. Mullin*, 317 F.3d 1196, 1220, 1224 (10th
Cir. 2003)).  On collateral review, an error is not "harmless" if it "had substantial and
injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.
In determining whether an error is harmless, the Court reviews "what effect the error had
or reasonably may be taken to have had upon the jury's decision."  *Id*. at 642-43.  An
error is not harmless is a reviewing court is "in grave doubt" as to whether the error had

MEMORANDUM ORDER 26

"substantial and injurious effect or influence." *O'Neal v. McAninch*, 513 U.S. 432 (1995).

Here, the jury heard the details of the circumstances under which the prior identifications took place and saw the video tape of the photo lineup. *State's Exhibit A-4*, at 1459-80. The jury also heard Petitioner's expert, Dr. Susan Amato, testify at length as to research regarding identifications and the various ways in which Curtis' identifications could be erroneous. *See State's Exhibit A-4*, at p. 1624-60.

Trevino's best friend, Tito Cantu, and the other passenger in the Suzuki, Clifford Valesquez, both testified against him. *See State's Exhibit A-4*. Trevino's girlfriend testified that he slept with her on the couch all night and did not leave the house; however, Trevino himself testified at trial that Trevino woke to a knock at the door, got up and answered the door, had a conversation with Cantu, gave Cantu the keys to his Suzuki, and got back in bed (on the couch) with his girlfriend – all without waking her up. *State's Exhibit A-4*, at p. 1888, 1889, and 1890. Therefore, his alibi that his girlfriend would have awakened had he not been sleeping beside her the whole night was substantially weakened by his own testimony.

Trevino's hand showed marks that could have come from firing the gun that killed Wiggins. *State's Exhibit A-3*, at pp. 1080 to 1113. Shotgun shells of the same type that were with the gun were found in Trevino's home. *State's Exhibit B-4*, at p. 2. There was no dispute that the gun was owned by Cantu, but that it had recently been kept at Trevino's house. *State's Exhibit A-4*, at p.1850. Trevino owned and wore a long black

MEMORANDUM ORDER 27

leather coat that same evening, as noted by Curtis.  *Id*. at 1367.

Trevino also testified that he agreed to report his Suzuki stolen, run it off a cliff, and apply for insurance proceeds – all because Cantu told him to do so without any explanation why.  *State's Exhibit A-4*, at p. 1893.   While there was not other circumstantial evidence linking Trevino to the crime, *see Petitioner's Brief,* at p. 18 (Docket No. 34), there was evidence presented that Trevino and his father devised a plan to hide Trevino's involvement in the crime, which could account for the lack of other circumstantial evidence.  *State's Exhibit A-4*, at 1175-77.

Given all of the evidence that was placed before the jury, the Court concludes that admission of the trial identification and the showup identification did not have a substantial and injurious effect or influence on the jury's verdict.  *Brecht*, 507 U.S. at 637. Because any alleged error regarding the showup evidence was harmless, the Court cannot grant habeas corpus relief even if it found that the error violated § 2254(d).

**D.     Claim 2**

Claim 2 is that the state court violated Petitioner's Sixth Amendment right to present a complete defense when it excluded the results of Petitioner's polygraph test at trial.  In the trial court, Petitioner filed a motion for the admission of his polygraph test and requested a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).  The trial court denied the hearing on the following bases:  (1)  under *State v. Fain*,  116 Idaho 82, 774 P.2d 252 (1989), absent a stipulation between the parties, a polygraph test is per se inadmissible in Idaho; (2) the polygraph test was done "late in

MEMORANDUM ORDER 28

the game," and the State had no chance for input or confirmation; and (3) even if the polygraph had a scientific basis, the polygraph would substitute its "credibility-finding mechanism" for that of the jury, which is impermissible. *State's Exhibit* A-3, at 517-22.

      1.    <u>United States Supreme Court Precedent</u>

At the time of Petitioner's motion for admissibility of his polygraph test, he relied solely upon *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which generally governs the admissibility of scientific evidence. At the time the Idaho Supreme Court decided Petitioner's polygraph issue on appeal, the United States Supreme Court had just issued an opinion rejecting the argument that the per se exclusion of polygraph evidence is unconstitutional in *United States v. Scheffer*, 523 U.S. 303 (1998).

In *Scheffer*, the United States Supreme Court reviewed Military Rule of Evidence 707 in the face of a defendant's challenge that a per se rule precluding admissibility of polygraph tests violated his Sixth Amendment right to present a defense. The *Scheffer* Court recognized that state rule makers retain "broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Id*. at 308. The Court explained that "[a] defendant's right to present relevant evidence is not unlimited, but is subject to reasonable restrictions." *Id*. at 308. The Court determined that "[s]uch rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id*. (citation omitted). The *Scheffer* Court concluded that the following were legitimate interests served by Rule

MEMORANDUM ORDER 29

707, and that Rule 707 was not "arbitrary or disproportionate in promoting these

interests": (1) ensuring that only reliable evidence is introduced at trial, (2) preserving

the court members' role in determining credibility, and (3) avoiding litigation that is

collateral to the primary purpose of the trial.   *Id.* at 309.   *Scheffer* also recognized that

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), did not foreclose,

"as a constitutional matter, per se exclusionary rules for certain types of expert or

scientific evidence."   523 U.S. at 312.

2.     Idaho Supreme Court Decision

The Idaho Supreme Court recognized *Scheffer* as standing for the principle that

"[t]he decision to admit or deny evidence . . . is within the discretion of the trial judge in

individual jurisdictions which may reasonably reach differing conclusions as to whether

polygraph evidence should be admitted."   *State's Exhibit B-4*, at p. 7.   However, likely

because *Scheffer* was issued after the state district court decided Petitioner's issue, the

Idaho Supreme Court focused on Petitioner's contention that the evidence should have

been admitted under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993):

> In *Daubert*, the Supreme Court held that the "general acceptance in
> the scientific community" standard for determining the admissibility of
> scientific evidence had been replaced by the Federal Rules of Evidence, in
> particular F.R.E. 702.  the *Daubert* court held that pursuant to Rule 702,
> the trial judge is assigned the task of ensuring that an expert's testimony
> both rests on a reliable foundation and is relevant to the task at hand.
> *Daubert*, 113 S. Ct. at 2799.  In other words, for scientific evidence to be
> admitted, it must be supported by appropriate validation, establishing a
> standard of evidentiary reliability, and must assist the trier of fact to

MEMORANDUM ORDER 30

understand the evidence or to determine a fact in issue.  *Id*. at 2795.

*State's Exhibit B-4* at pp. 6-7.

On the foregoing law, the Idaho Supreme Court opined:

> In denying admission of the polygraph results, the district judge addressed in part the concerns of *Daubert* when he reasoned that the polygraph in this case does not go to help the jury find facts but goes to substitute the jury's credibility-finding mechanism with physiological responses and their interpretation by psychologists.  The district court did not address the question of reliability of polygraph results as trial evidence nor whether polygraph evidence should be excluded as more prejudicial than probative under Rule 403.  The district court did not admit the polygraph results, relying on *State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989), *cert. denied* 493 U.S. 917 (1998), where this Court held the results of polygraph examinations inadmissible absent a stipulation by both parties, regardless of whether the polygraph testimony is exculpatory.  Under *Scheffer*, where the decision to admit polygraph evidence is left up to the individual jurisdictions, we hold that the district court acted within its discretion in rejecting the proposed use of the polygraph in this case and in ruling the polygraph results inadmissible.

*State's Exhibit D-12*, at p. 7 (internal citations omitted).

The state trial court, in part, explained its reasoning as follows:

> My biggest problem with polygraphs is that they do not give the jury any facts for deliberation.  They only give the jury an opinion as to credibility, which seems to be to be a significantly different result than any other scientific test we run – scientific tests in terms of accident reconstruction, in terms of the likeness or dislikes of chemical compounds, the chances of certain DNA being from any given individual or combination of individuals – now those are facts; but in a polygraph, basically the outcome is: I believe the individual, when questions, gave an answer, and his or her physiological responses indicate that they were not being deceptive, which is nothing more than credibility.  And I find that to be repugnant to the jury trial and, I think, makes it automatically inadmissible under [I.R.E.] 403, because it is not an issue for the fact finder, under [I.R.E.] 403 and 702, because it is not an issue of the – it is not a fact which helps the jury in their deliberative process.  It takes the

issue of credibility of witnesses away from the jury.

*State's Exhibit A-3*, at p. 498-99.

      3.        <u>Whether the State Court Unreasonably Applied the Law</u>

      In *Scheffer*, the Idaho Supreme Court stated that a per se rule against inadmissibility of certain types of evidence did not offend the Constitution.  523 U.S. at 312.  Therefore, Petitioner cannot prevail on an argument that the trial court's reliance on *Fain* violated his Sixth Amendment rights.

      Neither can Petitioner prevail on an argument that the Idaho Supreme Court's decision is contrary to United States Supreme Court precedent.  The trial court analyzed two of the legitimate bases for exclusion identified in *Scheffer* – that admission of a poygraph test invades the role of the jury, and that the court must allow only reliable evidence to be introduced at trial.  523 U.S. at 309.  The trial court assumed for purposes of Petitioner's motion, that there was a scientific basis for polygraph testing.  *State's Exhibit A-3*, at p. 519.  However, the trial court then determined that the state would be unfairly prejudiced in that it could not "reconfirm the actual test" and testing conditions, and therefore would be prejudiced by admission of the test results, absent a stipulation.  *Id.* at 520-22.  And, as included in the Idaho Supreme Court's decision, the trial court believed that the overwhelming reason for not allowing the polygraph is that it usurps the role of the jury in the fact-finding process.  There is nothing in this analysis that suggests the trial court's decision was arbitrary or disproportionate in serving the legitimate interests in the trial process it identified as relevant to Petitioner's particular

MEMORANDUM ORDER 32

case.

Based upon the foregoing, the Court concludes that Petitioner has not shown that the Idaho Supreme Court's decision affirming the trial court's refusal to admit Petitioner's own polygraph test is contrary to, or an unreasonable application of, United States Supreme Court precedent.  Therefore, this claims fails to warrant relief under 28 U.S.C. § 2254.

**E.      Claim 6**

Claim 6 is that Petitioner's right to the effective assistance of counsel was violated when trial counsel failed to call a photography expert to rebut the State's expert. At trial, the State called Dr. Kerry Patterson, an expert medical witness to testify that the scrapes on Petitioner's hands had been caused by firing a weapon.  Dr. Patterson based his opinion solely on photographs of Petitioner's hands.  *State's Exhibit A-3*, at pp. 1080 to 1113.  Petitioner argues that his counsel should have called Charles V. Morton, a photography expert, who would have testified that it is impossible to tell the age of a wound from looking at a photograph.  *See State's Exhibit D-1*, at p. 14.

1.      United States Supreme Court Precedent

*Strickland v. Washington* is clearly established case law which governs ineffective assistance of counsel claims.  466 U.S. 668 (1984).  In a federal habeas action, a claim for ineffective assistance of counsel presents a mixed question of law and fact.  *See id.,*

MEMORANDUM ORDER 33

466 U.S. at 698.  The state court findings of fact are presumed correct, unless the habeas

applicant rebuts this presumption by clear and convincing evidence.  28 U.S.C. §

2254(e)(1).  Absent such a rebuttal, the federal court must determine whether the state

court decision was either contrary to, or an unreasonable application of, *Strickland* based

upon the facts found by the state court.

In *Strickland*, the Court made it clear that "[t]he benchmark for judging any claim

of ineffectiveness must be whether counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied on as having

produced a just result."  466 U.S. at 686.  The *Strickland* test for ineffective assistance of

counsel requires two showings:

> First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so serious that
> counsel was not functioning as "counsel" guaranteed the defendant by the
> Sixth Amendment.  Second, the defendant must show that the deficient
> performance prejudiced his defense.  This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial with a
> reliable result.

*Id.*

In order for an attorney's performance to be deemed deficient under *Strickland*, it

must fall below an objective standard of reasonableness.  *Id.* at 687-88.  A reviewing

court's inquiry into the "reasonableness" of counsel's actions must begin with the

presumption that counsel acted effectively.  *Id.* at 689 (internal citation omitted).

A petitioner must establish both incompetence and prejudice to prove an

ineffective assistance of counsel case.  *Id.* at 697.  On habeas review, the court may

MEMORANDUM ORDER 34

consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial.  *Id.*

2.      Idaho Court of Appeals Decision

The Idaho Court of Appeals acknowledged *Strickland* and its test as guiding precedent.  *State's Exhibit D-12*, at p. 4-5.  The Idaho Court of Appeals first noted that Petitioner had failed to support his claim with any affidavits or other admissible evidence from the photography expert showing what his testimony would have been.  *Id.* at 6.

The Court of Appeals further concluded that "Trevino's counsel was not deficient for failing to call a photography expert to testify that one cannot tell the age of a wound by looking at a photograph, for Trevino himself testified at trial that he received the wounds on his hands at approximately the same time as the murder, albeit by means other than firing the shotgun." *Id*. at p. 6.  Because the expert's opinion would have impeached Trevino's own testimony as to when he received the wounds, the Court held that failure to call the photography expert could not have constituted deficient performance.  *Id*.

3.      Whether the State Court Unreasonably Applied the Law

This Court agrees that Petitioner has failed to show deficient performance or prejudice based upon the particular facts of his case.  Had Petitioner testified differently about the timing of his hand wounds, *e.g*., that they had occurred much earlier than the murder, rather than fairly contemporaneously with the murder, the photography expert's

MEMORANDUM ORDER 35

alleged testimony would have been beneficial to Petitioner's defense.  However, because Petitioner and Dr. Patterson both placed the hand wounds around the same time as the murder, then the photography expert's testimony would have been irrelevant.  *See State's Exhibit A-4*, at 1426, 1472-73 (photographs of Petitioner's hands taken the day he came to the police station to report his Suzuki stolen, May 14, 1995); *id.*, at pp. 1868-71 (Petitioner testified that he injured his hand removing carpeting on May 14 or 15, 1995). Based upon all of the foregoing, the Idaho Supreme Court's decision on Claim 6 was not contrary to, or an unreasonable application of, *Strickland*, and, therefore, Petitioner is not entitled to relief under § 2254.

## F.    Claim 7

Petitioner asserts that his counsel was constitutionally ineffective for failing to file an Idaho Criminal Rule 35 motion for reduction of sentence.  Petitioner was convicted of first degree murder, with a sentence enhancement for use of a firearm.  The state court sentenced Petitioner to 35 years determinate, with life indeterminate.  *State's Exhibit D-12*, at p.1.  As explained in his appellate brief, Petitioner's grounds for seeking a reduction of sentence were as follows:

> If in fact I was to be found guilty of a crime it was an excessive sentence because premeditation was not justly established.  The jury could have been given the instructions to find the ruling as an involuntary manslaughter because the crime was committed in a heated and/or physical altercation, and the parties claimed to not know each other.  Therefore, I conclude that my attorney should have filed a rule 35 to try to reduce the excessive sentence given.

*State's Exhibit D-1*, at p. 13.

MEMORANDUM ORDER 36

1.      United States Supreme Court Precedent

As noted above, the Idaho Court of Appeals correctly determined that

*Strickland's* test of deficient performance and prejudice governed Petitioner's claims.

2.      Idaho Court of Appeals Decision

The Idaho Court of Appeals concluded that Petitioner had failed to show that

there was evidence that his counsel could have presented in support of a motion for

reduction of sentence that would have created a reasonable likelihood that the sentencing

court would have reduced the sentence.  *State's Exhibit D-12*, at p. 5.  The Court of

Appeals held that, because Trevino failed to present any such evidence, he did not meet

his burden to show either deficient performance or prejudice.  *Id*.

3.      Whether the State Court Unreasonably Applied the Law

This Court has searched the record and has failed to find any grounds alleged to

be the basis for a motion for reduction of sentence, other than Petitioner's statements in

his appellate brief that he did not believe the premeditation element of first degree

murder had been met, and he believed that the fact that the killing had occurred in the

heat of an altercation between parties who didn't know each other.  At the sentencing

hearing, the trial court took into account the circumstances of the killing:

> Even though the victim in this matter was in a fist fight with one of
> your compatriots, that is not a strong provocation which would find
> leniency in this court.  I do not feel that the victim's criminal conduct was
> a strong reason for your criminal response, will not assert any sort of
> leniency on your behalf as a result.

*State's Exhibit A-4*, at p. 2240.

MEMORANDUM ORDER 37

Petitioner brings forward nothing showing that the court erred or would have changed its mind had it been presented with a Rule 35 motion on either the grounds asserted by Petitioner or any other grounds apparent in the record.  Petitioner's counsel brought forward a great deal of favorable evidence about Petitioner and his role as a son and father in his family.  Petitioner's counsel also discussed Petitioner's honorable military service and work history.  Petitioner's counsel also highlighted Petitioner's young age and his ability for rehabilitation. *See State's Exhibit A-4,* at pp.2223-2230. Petitioner brings forward nothing to show that the state court failed to consider, or that counsel failed to raise, facts that would have made a difference in sentencing had a Rule 35 motion been filed.  For these reasons, Petitioner's Claim 7 fails both prongs of *Strickland.*  As a result, habeas corpus relief is not warranted.

## III.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED:

A.     Respondent's Motion for Summary Judgment (Docket No. 27) is GRANTED.  Petitioner's Petition is dismissed with prejudice.

B.     Petitioner's Motion for Summary Judgment (Docket No. 35) is DENIED.

C.     Respondent's Motion for Extension of Time (Docket No. 37) is GRANTED.

MEMORANDUM ORDER 38

D.      Petitioner's Motion to Substitute Party (Docket No. 41) is GRANTED.


                        DATED:  **March 31, 2006**

                        _____
                        Honorable Mikel H. Williams
                        United States Magistrate Judge

MEMORANDUM ORDER 39